# CASES

# SUPREME JUDICIAL COURT,

## COUNTY OF YORK,

ARGUED APRIL TERM, 1848.

---

## JAMES RANGELY *versus* JOHN SPRING.

Where a mortgage was made by a husband and wife, of four separate parcels of land, of which three were the property of the wife, and the other of the husband, to secure a debt before due from him; and where an entry for condition broken was made by an attorney of the mortgagee, by entering upon one of the parcels belonging to the wife, having in his possession the mortgage deed, and stating in the presence and hearing of the husband and of two witnesses that "he entered for condition broken;" and where afterwards certain acts were done amounting to a waiver by the mortgagee of the entry thus made; and where, after the expiration of three years from the time of such entry, the mortgagee, with the assent and at the request of the husband, but without the knowledge of the wife, made a quitclaim deed of the premises to the demandant, he, however, not being present at the time, wherein it was said — "do hereby remise, release, bargain, sell and convey and forever quitclaim unto said, (the demandant,) the land described in said deed of mortgage, entry having been made to foreclose, and the right of redemption having expired, and the said, (the demandant) having at said (the husband's) request paid the amount which would be due on said mortgage. This release is made to said (demandant) at the request of said (mortgagors) and is intended to discharge all title acquired by said (mortgagee)"; — In a real action brought by the grantee of the mortgagee against the male mortgagor, *it was holden*, that as between them, the demandant was entitled to recover.

THIS was a writ of entry, wherein were demanded four several parcels of land in Saco, no one of them adjoining either

of the others, on one of which was a dwellinghouse and other buildings.

On January 4, 1830, Mrs. Olive Spring, the wife of the· tenant, was the undisputed owner of three of the lots, including that on which the buildings stood, and on that day joined with her husband in a mortgage to the Saco Bank, to secure the payment of a sum of money due from him to the bank, receiving back an obligation to re-convey to Mrs. Spring, the land belonging to her, on the payment of the money secured by the mortgage.

At the trial, before WHITMAN C. J., proof was offered tending to show, that on the 9th or 10th of May, 1833, an attorney of the bank made entry upon the parcel of land on which the dwellinghouse stood, in the language of the attorney, a witness for the demandant, he " did do certain acts to make an entry for condition broken of a mortgage from John Spring and wife to Saco Bank, by taking the deed of mortgage, and walking into the dwellinghouse of said Spring, and in one of the front rooms of the house stating in said John Spring's presence, that I entered for condition broken." This was done in the presence of two witnesses.

On Sept. 30, 1833, as the charter of the bank was about to expire, the corporation conveyed all their effects to three trustees for the benefit of the stockholders.

Testimony was offered, at the trial, by the tenant, to prove, that, on the 9th of May, 1836, Spring delivered over to one of the trustees, another being present, a check dated on the day following, and payable to the bearer on the 12th of July, 1836, drawn by David Webster on the Manufacturer's and Trader's Bank, and accepted by the bank, and offered to pay the balance in money, the sum then due to the bank being about $5140, and that it was then agreed between the parties that the trustees " should take said check, and hold the same, and if the check should be paid at maturity, that then the money due on the mortgage should be considered as paid on that day, and should have the same effect, as if paid on that day," and that the money for the check, and the balance also,

Rangely *v.* Spring.

was actually paid to the trustees on the 12th day of July following, and on that day credited to the stockholders in these words and figures. "By cash balance due on mortgage of Spring property, $5190,95." And that on the tenth day of May, 1836, the said Spring held a policy of insurance upon the dwellinghouse, and made an assignment thereof to the trustees in these words. "Know all men by these presents, that the within named John Spring in consideration that Jonathan King, Samuel Hartley and George Thacher, as trustees of the Saco Bank, the charter of which has now expired, hold a mortgage of the within described real estate, and being willing to secure them, do hereby set over and transfer to the said Jonathan King, Samuel Hartley and George Thacher for the use and benefit of the said stockholders, or whoever shall be interested in the within described buildings, this policy of insurance. To have and to hold the same to them, their heirs, assigns, or successors as trustees, as fully as I could do. Dated this tenth day of May, A. D. 1836.

"J. Spring. [L. s.]"

That this policy was delivered over to the trustees, and on the 12th of the same May, the transfer of the policy of insurance, at the request of the trustees, was assented to by the insurers. The presiding Judge rejected all such proof, excepting the payment of the money to the trustees.

On the 13th of July, 1836, the trustees in the presence of John Spring and at his request made and executed a deed of which the following is a copy.

"Know all men by these presents, that we Jonathan King, Samuel Hartley and George Thacher, of, &c., as trustees of the stockholders in a corporation now expired, called the President, Directors and Company of the Saco Bank, in consideration of five thousand one hundred and ninety dollars and ninety-five cents, paid by David Webster, of, &c., the receipt whereof we do hereby acknowledge, do hereby remise, release, bargain, sell and convey and forever quitclaim unto the said David Webster, his heirs and assigns forever, all the right, title

and interest in and to the land and buildings in said Saco, described in a deed of mortgage made by John Spring and Olive, his wife, to said corporation, dated January 4, 1830, recorded in the registry for York county, book 135, page 28, reference being had to said deed for a more particular description, entry having been made to foreclose and the right of redemption having expired, and said Webster having, at said Spring's request, paid the amount which would be due on said mortgage.

" This release is made to said Webster at the request of said Spring and wife, and is intended to discharge all title acquired by said corporation, the mortgage having been assigned to us in trust.

" To have and to hold," &c. Dated July 13, 1836, and signed by King, Hartley and Thacher, trustees, and recorded Feb. 13, 1837. At the time this deed was made, Mrs. Spring was not present, and it did not appear, that she had any knowledge of it.

At the time the check was handed by John Spring to the trustees, May 9, 1836, nothing was said respecting Webster, but that the check was drawn by him, and accepted by the bank on which it was drawn.

On April 18, 1838, Webster gave a deed of the premises to Daniel Burnham ; and on July 6, 1839, Rangely, the demandant, having previously recovered judgment, levied his execution upon the premises as the property of Webster and Burnham. The appraisers valued the property at the sum of nine thousand six hundred dollars.

Webster was not present at any of the times before mentioned.

The verdict for the demandant was to stand and judgment be entered thereon, unless the same is not supported by the evidence admitted and legally admissible, and the facts offered to be proved and not admitted and which should have been admitted, and would have essentially varied the state of the case. In such case the verdict is to be set aside and a new trial granted.

Rangely *v.* Spring.

This case was very fully argued in writing by

*S. Fessenden* and *S. Bradley* for the tenant : — and by *Howard*, for the demandant.

*Bradley*, in the opening argument, made these points : —

I.   No legal entry was made to foreclose the mortgage of the demanded premises.

The alleged entry was only upon one of several parcels of land included in the mortgage.   There can be no foreclosure of a mortgage, but by a compliance with some one of the modes authorized by the statute.   That does not permit an entry to be made on one of several tracts of land in the name of the whole.   There must be a peacable entry, and upon each lot.

The mortgagor might be willing, that there should be a peaceable entry into one lot, and not into another.   Even if the law admitted of an entry into one parcel in the name of the whole, there was no attempt to do it.   The language used, forbids the supposition.

Now it has been decided in this Court, in a recent case, that where several parcels of land are included in the same mortgage, there can be no foreclosure of the mortgage, as to one tract of the land without the whole is foreclosed.   *Spring* v. *Haines*, 21 Maine R. 126.   The same principle is found in Cruise's Dig. Tit. 15, c. 33, § 66, 67 ; 1 Powell on Mort. (Rand's Ed.) 389.

II.   If the Court overrule the case of *Spring* v. *Haines*, and decide that a legal entry was made, then we say, that the entry was waived by the trustees.

1.   By the receipt of the check of Spring on May 9, 1836, even if received as collateral security.

2.   By the receipt of the balance of the debt of Spring, on July 13, 1836.

3.   By taking the assignment of the policy of insurance from Spring to the trustees, under his hand and seal, on the tenth day of May, 1836, the day after the alleged expiration of the equity of redemption, and by procuring the assent of the president of the insurance company on July 12, 1836, to the

assignment.   The assignment to them is an estoppel by deed
against denying that the mortgage was an open and subsisting
mortgage on the tenth of May.   When an entry to foreclose,
once made, is waived, there is an end of it, and there can be
no foreclosure, but by commencing anew.   If there was a fore-
closure what right had the trustees to the security of the policy
when they had, as is now said, the absolute fee simple in
property worth twelve thousand dollars, to pay their debt of
$5190,95, and a check of $5000, good as cash besides.   The
entry was proved by parol, and the waiver of it, is not only
proved in the same manner, but by the acceptance of an as-
signment under seal of the policy.

In support of his reasoning upon this point, he cited 10
Peters, 507 ; 18 Maine R. 201 ; 5 Pick. 418 ; 5 Greenl. 153 ;
1 Powell on Mort. (Rand's Ed.) 380 to 402 ; 3 Sumn. 159 ;
4 Johns. R. 44 ; 3 Pick. 439 ; 8 Pick. 490 ; 2 Kent, 62 ; 9
Wheat. 489 ; 20 Maine R. 111 ; 5 Metc. 5 ; 8 Greenl. 219 ;
3 Johns. R. 531 ; 3 Fairf. 444 ; 18 Maine R. 357 ; 6 N. H.
Rep. 12 ; 11 N. H. Rep. 474 ; 1 Greenl. Ev. § 304 ; 7 Cow-
en, 48 ; 13 Wend. 75 ; 4 Pick. 527 ; 6 Peters, 466 ; 4
Shepl. 168.

III.   The next inquiry is, what was the effect of the pay-
ment on the title of the trustees of the bank ?   It is contended,
that, as the entry, if one was ever legally made, was waived ;
that, as the jury would be authorized to find, and must find,
that on July 12 and 13, 1836, the mortgage was an open and
subsisting mortgage, and that the debt secured by the mortgage
was fully paid on those days ; the title by the mortgage was
wholly divested and the premises entirely discharged therefrom.
This is believed to be the well settled law on this subject.
The following authorities, on this point, were cited, and com-
ments made upon most of them.   5 Mass. R. 237 ; 11 Mass.
R. 134 ; 2 Gallison, 152 ; 1 Cowen, 123 ; 6 Greenl. 260 ; 23
Maine R. 345 ; Rev. Stat. c. 125, § 10 ; 2 Greenl. 322 ; 8
Pick. 490 ; 5 Pick. 243 ; 2 Mason, 531 ; 18 Johns. R. 110 ;
5 Cowen, 248 and 671 ; 9 Cowen, 641 ; 3 Mason, 520 ; 5
Metc. 310 ; 14 Pick. 401 ; 1 Metc. 390 ; 1 J. J. Marshall, 257 ;
20 Maine R. 111.

The trustees of the bank, then, had nothing to convey to Webster, and could convey nothing to him. Nor did the trustees undertake to convey any thing, because the deed on its face says, that the intention was merely "to discharge all title acquired by the bank." 6 Pick. 499; 11 Pick. 289; 14 Pick. 95; 3 Mason, 520, 531.

IV. The tenant contends, that the title, both legal and equitable, was in him and his wife at the time this suit was commenced. Should it be pretended, that on any equitable principle, he is entitled to recover, he is met by a still stronger equity against him. He does not stand in the relation of an innocent purchaser, without notice of the title of Spring and wife. In the argument upon this point, he cited and commented upon the following authorities. 6 Johns. C. R. 417; 2 Sumn. 533; 14 Wend. 63; 22 Maine R. 316; 1 Story's Eq. § 400; 14 Pick. 231; 2 Powell on Mort. (Rand's Ed.) 564 and notes; 3 Johns. C. R. 344; 1 Story's Eq. § 395; 18 Maine R. 221; 3 Fairf. 453; 19 Maine R. 115; 3 Metc. 405.

V. Nor is the defendant estopped from setting up the defence relied upon by him. The present is an action at law. A man is not barred of his right to real estate by an estoppel, in an action at law, unless by record or deed. If he is to be barred of any right to defend his land by parol merely, then there may be a conveyance of land by parol. Personal property may be conveyed by parol, and therefore any proof showing a recognition by one claiming the property, that it belonged to another, would be admissible to show title.

He examined the decision of the Court in the present case, (21 Maine R. 130,) and in the case of *Hatch* v. *Kimball*, 16 Maine R. 146, and insisted, that neither of them authorized the assumption, that this Court had decided that a man can be barred of his land by parol proof, in an action at law, by way of estoppel. He also cited and examined the following authorities: — 1 Johns. Ch. 344; 6 Johns. Ch. 166; Story's Ag. § 91; 6 Ad. & Ellis, 469; 15 Mass. R. 153; 19 Maine R. 146; 2 Metc. 90; 1 Greenl. Ev. 26, note 2; 5 Metc. 476,

484; 4 Wend. 403; 7 Pick. 116; 16 Pick. 460; 1 Hill, 19; Roberts on Frauds, 94.

VI. If it should be said, that the deed from the trustees to Webster operated as an assignment of the mortgage, and on that ground, it is to be considered, that the demandant has a subsisting mortgage, it is sufficient to reply, that even if it · were so, the demandant has no right to the mortgage, as his only claim is under a levy upon the land, as the property of Webster. 3 Pick. 484; 16 Maine R. 345.

VII. If it be said, that the demandant has a title by the record, it is sufficient to reply, that the utmost that can be claimed by the records is an assignment of the mortgage, and that cannot with any plausibility be set up; and as has been before said, the levy of the plaintiff's execution upon the interest of a mortgagee of land is entirely void, and nothing passes by it.

*Howard*, for the demandant, in his argument, made the following points: —

I. The entry to foreclose the mortgage was legally made. Statute 1821, c. 39, § 1. An entry into one parcel of land, included in the deed, for the purpose of foreclosing the mortgage, is a sufficient entry into all the parcels. It is equivalent to an entry into one parcel in the name of the whole; and that is sufficient. Co. Lit. 252, (a); Stearns on Real Actions, § 3, 17; 1 Cruise, 64. And besides, as will be shown hereafter, Spring is estopped from denying, that there was a legal entry to foreclose the mortgage.

II. The foreclosure was complete at the expiration of three years from the entry. Statute 1821, c. 39, § 1.

1. It was not waived in May, 1836, by the reception of the check, or by the assignment of the policy.

2. But another view of the matter would seem to be conclusive, against the tenant, that the trustees had no power or right to waive the foreclosure. And if they could waive, they did not, as it could only be done by them as a body, and not separately as individuals. 6 Johns. R. 39; 6 Mass. R. 46; 1 Bos. & Pull. 235.

3. The entry to foreclose, or foreclosure was not waived by the payment of the money July 13, 1836. There can be no waiver of a legal estate once vested. The reception of the money was but the consideration of the conveyance. 1 Sumn. 118; 3 Sumn. 159; 6 N. H. Rep. 12.

4. If these acts can be considered as amounting to a waiver, then Spring afterwards waived all rights he might have had under the supposed waiver of the trustees; he waived their waiver. Co. Lit. 352, (a); Com. Dig. Estoppel, E. 9.

III. Spring is estopped from setting up a waiver; and from contesting the title of Webster, or of the demandant, who derives his title through Webster. The principle of estoppel, under the circumstances of this case, is applicable to it. The principle is applicable at law to real, as well as personal estate.

Estoppels are of three kinds — by matter of record, by matter in writing, and by matter in pais. Co. Litt. 352, (a and b); Com. Dig. Estoppel, A. 2; 1 Greenl. Ev. $ 207. The courts of common law have adopted the rule in chancery, as applicable to real estate. In Maine, in 16 Maine R. 146; 20 Maine R. 231; and 21 Maine R. 137. In Massachusetts, 14 Mass. R. 437; 18 Pick. 313; 23 Pick. 92; 2 Metc. 431. In New Hampshire, 6 N. H. Rep. 521. In Connecticut, 11 Conn. R. 248. In Pennsylvania, 7 Serg. & Rawle, 468, and 13 Serg. & R. 306. In New York, 8 Wend. 448; 9 Wend. 148; 12 Wend. 57; 3 Hill, 216. In England, 2 Ad. & Ellis, 256.

SHEPLEY J. did not sit in the case, having been called upon as a witness by the parties. WHITMAN C. J. and WELLS J. concurred in the result, that judgment should be rendered in favor of the demandant, each giving his reasons therefor. TENNEY J. dissented.

WHITMAN C. J. — This cause has been before us upon a former occasion, (21 Maine R. 130) upon the report of the Judge, who presided at a former trial; and a new trial was granted on account of the misdirection to the jury, in that

trial, that the consent of the defendant's wife was necessary to render a conveyance to one David Webster, by certain individuals, acting as the assignees of the Saco Bank, effectual. As the facts were presented to the Court at that time a strong impression was made, that it would be extremely iniquitous, that the defendant should be allowed to prevail ; and in delivering the opinion of the Court, as then formed, it was not deemed out of place for the Court to intimate such an impression. It was further stated, that it was a principle in equity, that, if one having a title to real estate, and standing by and seeing another person convey the same estate to a third person, without apprising such third person, that he was buying such estate of one who had no right to convey it, he would not be allowed afterwards to claim it against such grantee ; and that a similar principle had been recognized at common law. These views, not being those upon which the new trial was more particularly granted, were thrown out, without much research, and perhaps, somewhat loosely ; and may be regarded as *obiter dicta.*

The cause is now before us upon a report of the Judge, who presided at the new trial, in which a verdict was returned for the plaintiff, under an agreement, that, if it is not supported by the evidence admitted, and legally admissible, including such as was offered on the part of the defendant and rejected, and which should have been admitted, then, that judgment should be entered thereon ; and that otherwise, a new trial should be granted.

The plaintiff in this, as on the former trial, relied upon a title under a mortgage deed, made by the defendant and his wife, of the demanded premises, to the Saco Bank ; and a title deduced therefrom to himself. The premises were, at the time of making the mortgage, held by the defendant, partially, if not wholly, in right of his wife. No question appears to be made in argument, and none occurs to the Court, as to the chain of title posterior to the deed made by Jonathan King and others, as the trustees of the Saco Bank, to David Webster. In this deed the following description and recital is to be

found, viz.: " In consideration of five thousand one hundred and ninety dollars and ninety-five cents, paid by David Webster, &c., the receipt whereof we do hereby acknowledge, do hereby remise, release, *bargain, sell and convey*, and forever quitclaim unto the said David Webster, his heirs and assigns, all the right, title and interest in and to the land and buildings in said Saco, described in a deed of mortgage made by John Spring and Olive, his wife, to said corporation, dated January 4th, 1830, and recorded in the registry in York county, book 135, page 28, reference being had to said deed for a more particular description; *entry having been made to foreclose, and the right of redemption having expired;* and said Webster having, at said Spring's request, paid the amount, which would be due on said mortgage. This release is made to the said Webster at the request of the said Spring and wife; and is intended to discharge all title acquired by said corporation, the mortgage having been assigned to us in trust." To the operation of this deed, various objections are made ; some depending on the language contained in the deed itself, and others on the alleged want of power in the trustees to convey the premises.

As to the language of the deed, it is insisted that it imports nothing more than a discharge of the mortgage. The words " remise, release and forever quitclaim," and, " is intended to discharge all title acquired by said corporation, the mortgage having been assigned to us in trust," are supposed to amount to such discharge. If these were all the operative words, by way of showing the intention of the parties, to be found in the instrument, although the writing were made to a stranger, and not to the mortgagors, the construction might be such as is contended for. But this is very far from being the case. Every instrument in writing, must have effect according to what, from the nature of the instrument, taken in connection with the subject matter to which it relates, and the whole of the language used in it, must be believed to have been the intention and understanding of the parties to it.

The first difficulty in the way of the construction contended

for, arises from the fact, that the instrument was not made to the mortgagors themselves, or to either of them.

If a simple discharge of the mortgage were in view, how did it happen, that the instrument to effect such purpose, was made to a stranger; and not to those in whose favor it is alleged it was intended to operate. And this difficulty will be augmented, when it is considered, that the evidence is abundantly to the effect, that the instrument was not made at the personal solicitation of the grantee in it. The grantors never saw him personally in reference to it. Whatever he did, concerning the procuring it to be made, was done by his agent; and that agent was the defendant. How came the instrument, then, to be made to Webster, and not to the defendant himself? Judge Shepley states, that he drew the deed ; that he drew it at the request of the defendant, Webster not being present; and that he thinks the defendant did assume so far to act for Webster as to receive the deed. Jonathan King, another witness, and the grantor in the deed, principally active in the negotiation, preparatory to making it, says the deed was made to Webster, at the request of the defendant ; and that he never heard him express a wish that it should be made to any one else ; and that the defendant received it from him, with the original note and mortgage.

When we come to look at the deed, we find language in it, other than that relied upon by the defendant, by no means of an equivocal tendency in showing that a conveyance was actually intended. The deed recites the receipt of a consideration of five thousand one hundred and ninety dollars and ninety-five cents, as paid by Webster. It, however, recites, that it was paid at the request of the defendant, but not by him. We then find, not only the words remise, release and forever quitclaim, in the granting part of the deed, which of themselves might be equivocal, but the words bargain, sell and convey, which are not equivocal ; and are never used when a mere release is in contemplation. We find, then, the acknowledgment of a consideration for a conveyance, as received from Webster, and the appropriate words of a conveyance used. And

we next find the subject matter of a conveyance, viz. : all the right, title and interest in and to the premises, described in a deed of mortgage, made by the defendant and his wife, to said corporation, accompanied with a statement of an " entry, having been made to foreclose; and the right of redemption having expired." There is next the recital, much relied upon in the defence, in these words ; " This release is made to the said Webster at the request of the said Spring and wife, and is intended to discharge all title acquired by said corporation, the mortgage having been assigned to us in trust." These words, if the scope and design of the instrument were, in other respects, indicative of a mere intention to release and discharge the mortgage, might well be used.  But such language is sometimes used, and not inappropriately, where one wishes to rid himself of all concern in a transaction, and merely wishes to discharge himself from it, and turn it over to some one else.  In this instance, the trustees may well be considered as having intended to say, that they discharged the corporation and themselves from all concern with the mortgaged estate, and turned it over to Webster.  The whole tenor of the instrument would seem to show, that they could have meant nothing more, especially when we come to the *habendum*, which is in the common form contained in deeds of conveyance, viz. :  to hold to the grantee, his heirs, &c.  If nothing was intended to be conveyed, such an *habendum* would have been absurd.  It would seem that no one could read such a deed, and entertain a doubt, that an estate was intended to be conveyed.  If such were not the intention, why was any language used, not appropriate to a mere naked release.  The deed was not written by one unacquainted with the language suitable to such purpose ; and it was written at the request of one, who, beyond any one else, was interested to have it so drawn, if such were the design of it.

The ground that the trustees were not vested with power to make the conveyance does not seem to be sustainable.  The deed to them was under the corporate seal of the Saco Bank, and signed and acknowledged by their president, the head of the

corporation. This was, therefore, the deed of the corporation itself. It was not a deed made for them, by a person to whom authority for the purpose had been delegated. " Though a corporation can do almost any business of a commercial nature, by a resolution, without seal, yet the conveyance of land is not one of the excepted cases ; and they cannot convey or mortgage, but under their corporate seal." 4 Kent, 451. The affixing of the common seal to a deed of conveyance, by a corporation, is sufficient to pass the estate even without a formal delivery. *Derby C. Co.* v. *Wilmot*, 9 East, 360. The common seal gives perfection to corporation deeds. Jacob, Title, Corporation, II. The deed of the bank, to the trustees, conveys the property mortgaged by Spring and wife, the same as it does their other real estate. This deed was duly recorded, and contained all that strangers could be expected to regard, in reference to the title of the trustees. Webster, in taking his deed, had a right to rely upon it as he found it upon record. Any votes or instructions the corporation might pass or give to the trustees, was a matter between those two parties, with which Webster had nothing to do.

But the circumstances, legitimately in evidence in this case, are such as do not call upon us minutely and critically, either to examine into the authority of the trustees to make the conveyance in the manner they did, to Webster, or the effect of the acts relied upon to prove a redemption of the premises from the operation of the mortgage. For it cannot be doubted, that if Webster, arising from any such facts, could take nothing by his deed, he must be considered as having been led into an egregious misapprehension ; and that, too, through the instrumentality of the defendant. And we should be sorry to doubt, that, what the defendant did, in accomplishing the negotiation, was, at the time, done in good faith on his part. The evidence shows his great anxiety lest he should lose the estate, while it was in the hands of the trustees; and no one can doubt, that in procuring a transfer of it to Webster from the trustees, he must have been actuated by some arrangement, between him and Webster, whereby such loss

would not become inevitable. What this arrangement may have been has not, in the last trial, been developed; and in the former did not, perhaps, appear by competent evidence, though a document was admitted as such, by the Judge, who presided at it. Although, at present, we must regard ourselves as uninformed as to what the arrangement was, we cannot think, that a jury could have doubted that there was one, which, at the time, was satisfactory to the defendant; nor that, at the same time, that he was procuring a conveyance, absolute in terms, to be made to Webster, his mind was put at rest as to the danger of ultimately losing the estate. We are not at liberty to doubt the capacity of the defendant to read, and understand what was presented to him in plain English, and which he *himself* had procured to be written, nor that he must have had full knowledge, that he had caused, of his own mere motion, a deed to be made, purporting to be to Webster; and conveying to him in fee, the demanded premises, in consideration of five thousand one hundred and ninety dollars and ninety-five cents, paid by him; and setting forth, that they were an estate which the defendant and his wife had mortgaged to the Saco Bank; and that an entry had been made thereon to foreclose; and that the time of redemption had expired, all tending to give Webster to understand, that an indefeasible estate was thereby conveyed. And, as the evidence was, no jury could fairly be at liberty to doubt such facts.

Notwithstanding all which, it is proposed to show, that King and others had no power to convey the premises; and that in fact the amount received by them, which purports in their deed, to be the consideration for their conveyance, was intended as, and for, and was in effect, a redemption of the mortgaged estate; so that King and others had no estate to convey; and it is contended, that the defendant, at law, is not precluded from availing himself of such facts. In equity, nevertheless, it is not denied, that he would be estopped. And Mr. Chancellor Kent, in *Storrs & al.* v. *Barker,* lays down the rule, with great precision, and in accordance with numerous authorities, to be, that, " where one having title, acquiesces

knowingly and freely, in the disposition of his property, for a valuable consideration, by a person pretending to title, and having color of title, he shall be bound by that disposition of property ; and, especially, if he encouraged the parties to deal with each other in such sale or purchase."

If such be the settled rule in equity, it must amount to an entire refutation of the argument of the defendant's counsel, that such doctrine is repugnant to the statute of frauds, and to that concerning the conveyance of real estate. Courts of equity are no more at liberty to disregard, what can be deemed statutory enactments, than are courts of law. The statute of frauds must not be construed so as, unnecessarily, to open a door to the commission of fraud. The rule above cited, is admitted, in reference to the personalty to have full operation at law, but it is denied that it has in reference to the realty.

We must now examine and ascertain whether such a distinction is well founded, and ought to be recognized as such, in the courts of this State. The reason for the distinction does not seem to be very obvious. No rule is more familiar than, that, in reference to real estate, persons are estopped from setting up titles in themselves, in opposition to recitals in their deeds. In such cases though there may be nothing like operative words of conveyance in the recitals, yet, if they be such, that the attempt to claim an estate, adversely thereto, by individuals, who had made the recitals, to the injury of those who had a right to depend on the truth of them, would be repelled at law, as well as in equity, and be adjudged tantamount to a relinquishment of title to the latter. Again ; if one has taken a conveyance, purporting to be by deed of general warranty, and the grantor's widow afterwards claims dower in the estate, purporting to be so conveyed, how often has it been held in this State, that the grantee is estopped from showing that the title, at the time of the conveyance, was not in the grantor, but had before been in the grantee, or in some one else under whom he claims? *Nason* v. *Allen*, 6 Greenl. 243 ; *Haines* v. *Gardner & al.*, 1 Fairf. 383. Again ; though the

statute concerning conveyances of real estate formerly provided, that a deed, to be effectual against others than the grantor, his heirs and devisees, must be recorded, yet it was held that actual notice to a second grantee, prior to a conveyance to him, of the existence of the prior grant, though not recorded, would be a bar to the claim of the second grantee of the same premises.    Courts often look to the reason of the rule prescribed ; and when that ceases the rule is treated as inapplicable to the case.

In the *Welland Canal Co.* v. *Hathaway,* 8 Wend. 480, we find it laid down, that estoppels are of two kinds, viz. : those technically such, as by deed, &c., which must be pleaded, to make them absolutely such, and those *in pais,* which, though not pleaded, may be given in evidence, so as to operate as effectually as those technically such.    Mr. Justice Nelson, in delivering the opinion, says, " In many, and probably in most instances, whether the act or admission shall operate by way of estoppel or not, must depend upon the circumstances of the case. As a general rule a party will be concluded from denying his own acts or admissions which were expressly designed to influence the conduct of another, and did so influence it, and when such denial will operate to the injury of the latter."    Estoppels, therefore, are not always to be deemed odious.    When not technically such they can only be used in the furtherance of right, and the promotion of justice ; and such are never sanctioned, but when they are seen to be of that tendency.    And of this character is the rule relied upon by the plaintiff in this case.    And why it should be a good rule every where in regard to the personalty, and not as to the realty, is not so easily comprehensible.    What would be justice in the one case would be equally so in the other ; and, in equity, is admitted accordingly ; and why should it not be so at common law ?

What are the objects of legal rules ?    Surely the promotion of justice.    The common law aims at that object ; and especially at the promotion of fair dealing among men, and the prevention, in an especial manner, of whatever would be in effect a fraud.    Whatever rule would be conducive to this end

it would ordinarily adopt; and none sooner than the one in question, which has confessedly been adopted already in regard to the personalty. The common law is characterized, as being founded upon reason, and as being "the perfection of reason, acquired by long study, observation and experience, and refined by learned men in all ages." Its principles accumulate with the experience of ages, adapting themselves to the progress of society in knowledge and civilization. Accordingly, no one of the elder States in the union is without its common law principles, not to be found in the common law of the mother country, adapted to its own peculiar situation and wants.

The rule in question is no new rule. It has long been clearly defined, and well settled in equity jurisprudence, and of unlimited operation. Why should it not be so in proceedings at comon law? If it is a salutary principle in one court how can it be otherwise in the other? It is admitted, that the common law courts of Pennsylvania have adopted it. And they have adopted many others of the principles, which had first received their sanction in courts of equity. *Wents* v. *Dehaven*, 1 Serg. & Rawle, 312. If the courts there have adopted the principle in question, there would seem to be no good reason why we should not do so. But, in opposition to our doing so, the counsel for the defendant say, that we have a court of equity; and, as the junior counsel erroneously alleges, of general equity jurisdiction. If he were right in that particular, it would seem to be strange, if not preposterous, that we, at law, must turn a party over to another tribunal, to enable him to avail himself of a well known, well defined and well settled rule in jurisprudence, as applicable in a rational point of view, to proceeding in the one tribunal as in those of another; and which had already been adopted to some extent in both; and, especially, when, as in this State, the very court, which is to decide in equity, is the same tribunal which is to decide at law. But general equity powers are very far from being conferred upon any tribunal here. The powers of that kind, existing here, are conferred upon this

Court, and are comparatively few in number, and are specific. We have, it is true, equity jurisdiction in matters of fraud. But in this case we have not been led to suppose, that the defendant, in procuring the deed to Webster, meditated a fraud ; and there is no reason to suppose that a bill alleging it could be sustained. The defendant, in setting up the defence he now relies upon, is endeavoring to avail himself of what he deems to be a legal right, in doing which he affords no ground for the plaintiff to proceed against him as and for fraud. The defendant has or has not a legal right to prevail. If he has, he cannot be guilty of fraud. If he has not, the plaintiff will have no occasion to accuse him of any thing of the kind.

In Massachusetts, there have been strong indications, that the principle in question would be adopted by her Supreme Court as at common law, whenever a fit occasion may call for it. In *Barnard* v. *Pope,* 14 Mass. R. 437, Mr. C. J. Parker says, " if it appeared, that, when William Barnard conveyed to Peck, the petitioner stood by, knowing that his brother was about conveying a moiety, and had declared that he had conveyed his share to him, the case would be analogous to those alluded to ; and would deserve serious inquiry, whether so manifest a fraud must prevail in a court of law."

Even in England, where there is a court of chancery of the most extensive jurisdiction, it is believed there are indications of a similar tendency, in their courts of law. In *Hearne* v. *Rogers,* 9 B. & C. 577, Mr. Justice Bailey, in delivering the opinion of the Court, says, " there is no doubt but that the express admissions of a party to the suit, or admissions implied from his conduct, are evidence and strong evidence against him, but we think that he is at liberty to prove, that such admissions were mistaken, or were untrue, and is not estopped or concluded by them, *unless another person has been induced by them to alter his conduct.* In such a case the party is estopped from disputing their truth with respect to that person." The case then before the Court was trover for goods sold.

The plaintiff had been erroneously declared a bankrupt; and his goods had been sold by an assignee. The defence was, that by his own acts he had induced the sale. To make out the defence it was proved, that he, as a bankrupt, surrendered a lease, which he held of a tenement, &c. Upon this the same Judge remarked, that this was between other parties, and therefore no estoppel; but that if he were to bring trover for his lease, *or ejectment to recover the land,* he would not be permitted to deny, that he was a bankrupt, to avoid the effect of the surrender. And in *the King* v. *the Inhabitants of Butterton,* 6 T. R. 554, Mr. Justice Lawrence said, " I remember a case some years ago, in which Lord Mansfield would not suffer a man to recover, even in ejectment, where he had stood by and seen the defendant build on his land." Lord Mansfield was certainly one of the greatest lawyers that ever sat on the English bench ; and it cannot be questioned that he did more than any other Judge ever did, by way of improving the common law of England, by the adoption of equitable principles, not before recognized as belonging to it. His opinion, in this instance, can but be entitled to very great weight, as it must have been acquiesced in by the counsel engaged in the cause, as otherwise the point would have been reserved for further consideration, and would have appeared in the reports. It is true, however, that Mr. Chancellor Kent, while sitting as chancellor, once threw out a doubt of the correctness of such a decision at law. But if such a Judge as Lord Mansfield, where there was a court of equity of general jurisdiction in equity matters, could so decide, can it be that we should not do so, where so important a principle could not otherwise be brought into operation in reference to titles to real estate ?

This adoption of principles at law, that have grown up in, and have long been sanctioned by courts of equity, is very far from being a novelty or unprecedented; even where both courts exist. Mr. Chancellor Kent, himself, in his valuable commentaries, vol. 4, § 15, holds this language. " The narrow and precarious character of the mortgagor, at law, is

changed under the more enlarged and liberal jurisdiction of the courts of equity. Their influence has reached the courts of law ; and the case of mortgages is one of the most splendid instances, in the history of our jurisprudence, of the triumph of equitable principles, over technical rules ; and of the homage, which those principles have received by their adoption in courts of law."

Mr. Justice Buller, in *Goodtitle* v. *Morgan*, 1 D. & E., at page 762, remarked, in regard to a title claimed by a mortgagee, who had had the precaution to take, with his mortgage, the title deeds of the mortgagor, and which in equity had been held to make a title paramount to that of a prior mortgagee, who had not taken such precaution, that, " if this has become a rule of property in a court of equity, it ought to be adopted in a court of law ; " and the decision of the court in that case, presented the very point, there having been no notice to the subsequent mortgagee of the existence of the prior mortgage. And the same learned Judge, in *Farr* v. *Newman*, 4 D. & E., at page 636, remarks, that, " when a rule of property is settled in a court in equity, and there are no decisions against it at law, I am as ready as any man to follow the line of equity ; for I think it absurd and injurious to the community, that different rules should prevail in different courts on the same subject." Ram on Legal Judgments, p. 29, is to the same effect. It may be remarked, that it is a fundamental principle in equity, that *equitas sequitur legem.* If so, when we find a rule, as to the title to property, settled in equity, it would seem to be but evidence, that such was the settled law every where in the same country, and so to be recognized in all its courts. Lord Elden says, in *Smith* v. *Doe*, 7 Price, 509, in regard to courts of law. " they should inquire of decisions in courts of equity, not for points founded on determinations merely equitable, but for legal judgments, proceeding upon legal grounds, such as those courts of equity have, for a long series of years, been in the daily habit of pronouncing as the foundation of their directions and decrees.

In *Morrison* v. *Morrison*, 2 Dana, 15, it was held, that one, seeing another buying an estate, and having a title to it, and giving no notice of it, should be postponed to the one seen to be buying it. In *Morse* v. *Child & al.* 6 N. H. Rep. 521, which was a writ of entry, and, of course, at law, the reporter's abstract is, " One who has acted as an appraiser in making an extent of an execution upon land, may be estopped to set up a title against the title acquired by the extent." Mr. Justice Green, in that case, said ; " If the extent, under which the tenant claims, had been perfected so as to be sufficient to pass the land, and it had appeared, that Fifield (the appraiser) set up no claim when the extent was made, we are not prepared to say that Fifield, or any one claiming under him, could have been permitted to set up a title against the extent." In *Marston* v. *Brackett*, 9 N. H. Rep. 336, in equity, Mr. C. J. Parker remarks, " If the defendant's claim had been under an absolute deed, there would have been great force in the position, viz. one being present at the sale, and seeing repairs made, and giving no notice of his title, shall be estopped from afterwards making claim to the estate so transferred ;" and cites the case of *Morse* v. *Child & al.* as authoritative. And in *Thomson* v. *Sanborn*, 11 N. H. Rep. the same learned Judge remarks, that " it is an established rule in a court of equity, that the second mortgagee, who has the title deeds, without notice of any prior incumbrance, shall be preferred ; because, if a mortgagee lend money upon mortgage, without taking the title deeds, he enables the mortgagor to commit a fraud. If this has become a rule of property in a court of equity it ought to be adopted in a court of law." These decisions seem to settle the law on this subject in the State of New Hampshire.

We come now to the case of *Hatch* v. *Kimball*, in this Court, 16 Maine R. 146, an action at common law, in which this doctrine seems to have been fully adopted. This was a real action. The tenant was held by his conduct, in reference to the plaintiff, to have precluded himself from sustaining his defence. The reporter's abstract, at the head of the case,

shows, that he understood it to be therein held, that, "If the owner of land, knowingly stands by and suffers another to purchase it, and expend his money thereon, under an erroneous impression, that the legal title is acquired thereby, without making his own title known, he shall not afterwards be permitted to exercise his legal rights, against such purchaser." But, perhaps, the decision itself did not go quite so far. If, however, the case were such as the reporter has supposed, a fraudulent intent might well be inferred; and no one should be allowed to avail himself of benefit from his own fraudulent act; and this is a principle adopted, as well at law as in equity. It would be the duty of both courts equally to guard against an iniquitous result. For such purpose it is not unusual, as before shown, whenever new cases arise, to call in aid principles well established, but not before applied. And when a case, like the one before us, arises, in which, to allow the defence set up to prevail would be obviously a perversion of the principles of justice, it would seem to be inadmissible, that, to prevent it, we should be withheld from the adoption of a principle, long sanctioned by a court, practising merely under other forms; and a principle too, which must approve itself to the mind of every enlightened jurist. We do not think, therefore, whenever a case may require it, that the principle in question should not be applied in its fullest extent, as well at law as in equity.

But, in the case before us, it may not be necessary that we should apply it in its broadest extent. We need, only, to keep within it so far as it is most explicitly and emphatically recognized as sound law by Lord Denman, in delivering the opinion of the court of King's Bench, in *Pickard* v. *Sears &* *al.* 6 Adol. & Ell. 469; in which he says, "the rule of law is clear, that where one by his words or conduct wilfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time; and the plaintiff in this case might have parted with his

interest in the property by verbal gift or sale, without any of those formalities, *that throw technical obstacles in the way of legal evidence.*" The proof to establish the defendant's position, that the premises had been redeemed, was dependant wholly upon oral testimony. The deed to Webster, as we have seen, has no tendency to prove any such fact. And oral testimony was clearly admissible to rebut the allegation. The defendant's admissions, whether express or arising from his conduct, are deemed the best evidence against him; and where he wittingly and willingly thereby induces another to alter his position, so far as that other is concerned, are conclusive. Now no one can doubt, that, by the acts and doings of the defendant, Webster was induced to take the deed in question, without any reason to entertain a doubt, but that he was acquiring a title to the premises; and the defendant, at the time, could not have supposed otherwise. Here, then, there were no "technical obstacles in the way of legal evidence." No deed of bargain and sale or title by fine and recovery was to be presumed. The defendant and his wife had made their deed to the bank, and the bank had assigned its right to Webster. Here was a chain of title made out in the form by law required, and duly registered. The defendant would destroy it by matter *in pais;* and the plaintiff shows him, by his own acts and admissions, to be precluded from doing so. We think, therefore, that the verdict is well supported by the evidence, which was clearly admissible.

I am not to be understood in coming to this conclusion, however, as intimating any opinion as to what may be the legal rights of the defendant's wife, should she survive him, or of her heirs. The acts and admissions of the defendant will not then, be admissible, except in so far as she has joined him therein, in the conveyance of the estate, to prevent the establishment of the fact, that a redemption in truth was the result of what took place, between the defendant, and the grantors to Webster.                    *Judgment on the verdict.*

Rangely *v.* Spring.

WELLS J. — This case, reported in 21 Maine R. 130, again comes before the Court.

The demanded premises were conveyed, in mortgage, to the Saco Bank, Jan. 4, 1830, by John Spring and his wife. The bank, by its president, whose authority was derived from a vote of the stockholders, by deed of Sept. 30, 1833, to which its corporate seal was affixed, conveyed the premises in controversy, with other real estate, to Jonathan King, and two others, and their heirs, in trust " to dispose of, sell and collect, for the use and benefit of the stockholders, &c." This deed is in proper form, and contains the appropriate terms, by which, to pass the title. The bank does not question its validity. The trustees, July 13, 1836, in consideration of $5190,95 paid by David Webster, "remise, release, bargain, sell and convey and forever quitclaim," &c. to Webster and his heirs, all their title and interest in the premises. In it is recited, that the right of redemption had expired, that Webster, at Spring's request, paid the amount, "which would be due on said mortgage," and that "this *release* is made to said Webster, at the request of said Spring and wife, and is intended to discharge all title acquired by said corporation, the mortgage having been assigned to us in trust."

It was the manifest intention of the trustees to convey whatever interest, they had derived from the bank, to Webster, who had paid, as a consideration for the conveyance, a sum equal to what "would be due on said mortgage." The deed is in the usual form of quitclaim deeds, by which real estate is daily transferred, from one person to another, and is a well recognized mode of conveyance. The word " discharge," contained in the recital, must be construed in reference to the other and more controling language. " This *release*, is made to said Webster," &c. is a phrase in perfect accordance with the other parts of the deed. The word " discharge," when taken in connection, with the word " release," and the rest of the deed, can mean nothing more, than that the bank had no remaining claim upon the property, and whatever title

it had acquired was released to Webster, at the request of Spring and his wife.

The cases of *Wade* v. *Howard et al.* 6 Pick. 492, and 11 Pick. 289, are relied upon, with confidence, to show, that no title passed to Webster. It appears that Wade purchased a conveyance of the equity of redemption of land, subject to two mortgages, and that on the day before the first mortgage was foreclosed, he paid the amount of it to Willard, the assignee of the mortgagee, the assignee holding the first mortgage, in trust for the owners of the second mortgage. Willard's deed to Wade contains terms, similar to those in the deed to Webster, with this recital, " the aforesaid sum having been this day paid me in discharge of said mortgage." The court considered in its first decision, that Wade stood in the place of the mortgagor, he having become the owner of the right of redemption, and that the recital in the deed, indicated the intention of the parties, that the money was paid to discharge the mortgage, and that it would be unjust for the mortgagor or any one succeeding to his right to redeem, to exercise that right, in relation to the first mortgage, and claim the property as foreclosed, against the owners of the second mortgage. And although it appeared, upon the investigation of the case the second time, that Wade's purchase of the equity was defective, the Court adhered to its opinion, because the deed to him was made upon the supposition, though erroneous, that he was the owner of the equity of redemption, and the intention of the parties ought to govern.

If the trustees had made their deed to Spring and his wife, or any one owning their right to redeem, and there had existed two mortgages, and the mortgage to the bank had been the first, and there had been such a recital in the deed, as is contained in Willard's deed, there would have been a closer analogy between the cases, but as they are in reality, they are widely different. The recital, in Willard's deed, is positive and express that the money was paid to discharge the mortgage. In the deed of the trustees, the amount paid is that, " which *would* be due on said mortgage." This language implies, that

the mortgage, as such, is at an end, and had ripened into an absolute estate. But there is no need of looking at words, which may be regarded as equivocal in their meaning; for it is stated, that the "right of redemption having expired." Does this language mean, that the right had *not* expired, and that Spring was paying the money to discharge the mortgage? The phrase " and is intended to discharge all title acquired by said corporation, the mortgage having been assigned to us in trust," may have been inserted for the purpose of affirming the power possessed by the trustees over the property. The recital "at the request of said Spring and wife," was inserted, probably, to exhibit the reason, why a conveyance was not made to Spring and wife, according to the agreement of the bank, Jan. 4, 1830; in which it was stipulated, that part of the property mortgaged should be conveyed to Mrs. Spring, and the residue reconveyed to Spring, upon the payment of all his paper in the bank.

It is very properly said, that such a recital was not necessary to pass the estate to Webster. In the case cited, 11 Pick. the form of the deed was appropriate to pass the legal estate, as was there decided. A release, if the releaser is seized, or if made to the disseizee, passes the estate. *Pray* v. *Pierce,* 7 Mass. R. 381; *Russell* v. *Coffin,* 8 Pick. 143. The possession of Spring was in submission to the title of the trustees. If the mortgage had been paid, the tenant, being in possession, could not be disturbed. But the facts do not show a payment to discharge the mortgage.

The parol evidence introduced did not contradict the deed, but corroborated it. It did not, therefore, affect the rights of the parties.

So far as appears by the deed itself, the title passed from the trustees to David Webster.

But it is objected, that the trustees had no power to make this conveyance. Is the objection a valid one? By the deed of the bank to the trustees, they were " to dispose of, sell and collect" the property conveyed to them. At that time, the

bank could not know, whether the mortgage would be foreclosed or not; and the language used, was broad enough, to enable the trustees, either to collect the debt, secured by the mortgage, or sell the interest of the bank, in the premises. It also appears by a vote of the stockholders, passed Sept. 30, 1833, that the deed to the trustees, containing the powers before mentioned, was confirmed, as the deed of the bank; and on that day, one of the trustees was chosen. If the votes passed August 31, conferred powers more limited, the last vote is entirely effectual to confer the powers, actually contained in the deed. It does not appear, that the bank adopted any other mode of conveyance to the trustees, than that by the deed of Sept. 30.

The tenant offers to prove, that before the time of redemption expired, the trustees agreed to discharge the mortgage, if the check, received by King, should be paid, according to its tenor, and that it was so paid, with the balance, and the note and mortgage were delivered to Spring. It appears, that the trustees were willing to perform their promise, but instead of claiming a performance of it, Spring directs them to convey the premises to Webster. He might have had the mortgage discharged, notwithstanding the lapse of time, but he waives the promise made by the trustees, and allows the foreclosure to remain, and the estate to become absolute.

Such was the expression of his will. His intentions were manifested by his acts, and by the deed, which he procured the trustees to make to Webster. The promise, made by the trustees, was prevented from being executed, by the interposition of Spring. All the parties considered the mortgage foreclosed, and if so, the estate was absolute, and the taking of the note and mortgage deed by Spring, could have no effect upon the title.

The fair construction to be put upon the possession of the note and mortgage would be, that he held them for the benefit of Webster, to whom he directed the deed to be made. The admission of these facts in evidence could not alter the result.

It is quite apparent, that the title of the bank, through the trustees, passed to Webster.

The next question, which arises in the case, is, whether the mortgage was foreclosed? For if it were not, then the demandant could not levy upon it, as the property of Webster; he having an assignment of the mortgage, and standing in the place of the bank. *Smith* v. *People's Bank*, 24 Maine R. 185.

Oct. 8, 1831, the bank, at a meeting of the stockholders, appointed Ether Shepley, Esq., an "agent for the collection of the debts due to the Saco Bank," and "to receive of the bank the funds and paper, and therewith to redeem the bills and pay the deposits," &c. Judge Shepley states in his second deposition, that the entry to foreclose was made "on or about the ninth day of May, 1833." The charter of the bank was drawing to a close, and it was solicitous to collect its debts. There does not appear to be any express authority, given to the agent, to make entries into lands. But one mode of collecting a debt, secured by mortgage, is to procure a foreclosure, and convert a conditional into an absolute estate, by which the debt will be satisfied, to the extent of the value of the property mortgaged. The entry, made by him, appears to have been ratified by the trustees, and recognized by Spring, who was excited to action by it, and in reference to which, he procured the promise of the trustees, as offered to be proved by him. And in the deed to Webster, made under the supervision of the tenant, it is said, "entry having been made to foreclose." Neither the entry nor the authority to make it, were controverted by any of the parties interested, at the time of making the deed to Webster. Judge Shepley's deposition shows, that he made the entry as attorney for the bank, but does not state the mode, in which the authority was conferred.

It appears by his depositions, and by the testimony of Seth S. Fairfield, that the entry was made into the dwellinghouse of Spring, which was standing on one parcel of the demanded

premises. Fairfield says, " that Spring was present, and he thinks Mrs. Spring, but is not positive of her being present, that Mr. Shepley said he entered for the purpose of foreclosing a mortgage of the Saco Bank, that he subscribed a paper, setting forth the fact of the entry made by Shepley, but whether on the deed or a separate piece of paper, he does not recollect — that the other witness was Greenleaf Thorn, and that Thorn signed a paper, that he cannot recollect the language Shepley used, but the amount of it was, that he entered to foreclose the mortgage to the bank." Judge Shepley says, in the deposition taken at the request of the tenant, Spring, " I did, as attorney for the Saco Bank, do certain acts, to make an entry for condition broken of a mortgage from John Spring and wife to said bank, by taking the deed of mortgage, and walking into the dwellinghouse of said Spring, and in one of the front rooms of the house, stating in said Spring's presence, that I entered for condition broken, and believe that I made a memorandum in writing, on the back of said deed to that effect, and that I did so in the presence of two witnesses, who subscribed the same, I am not certain who those witnesses were, but believe they may have been Seth S. Fairfield and John F. Hartley, Esquires."

The tenant was duly requested to produce the deed, upon which the memorandum was supposed to have been made, but did not do it.

One of the modes of entry to foreclose a mortgage, provided by stat. 1821, c. 39, § 1, is " by the mortgagee's taking peaceable and open possession of the premises mortgaged, in the presence of two witnesses." Subsequent statutes made it necessary to perform other acts, but the law of 1821 was the only law, regulating such entries, in force, when the entry in question was made. The name of one of the two witnesses, to the entry, does not appear to be made certain, but that it was made, " in the presence of two witnesses," is a fact well established. If the certificate were produced, by the tenant, it would probably corroborate the testimony, relative to the entry, which appears to have been legally made.

The entry was upon one lot, by entering into the dwelling-house, and declaring the entry to be made for condition broken, the agent having the deed of mortgage, with him, when he made the entry. Fairfield says, that the amount of the language was, that " he entered to foreclose the mortgage to the bank." Spring must have understood the language used, as applied to the several parcels, embraced in the deed ; and that the entry then made was intended to affect the mortgage, and whatever was embraced in it. When an agent declares, that he enters to foreclose the " mortgage," it must be understood, that it is for the whole, and not for a part of the premises, described in the mortgage. If the entry had been intended to be restricted to one parcel, the agent would have said so. The several parcels were situate in Saco Village, but did not adjoin. The agent must be understood as entering into one parcel for the whole and the language used as indicating that purpose.

" But an entry in one part of the land, in the name of all the land subject to one condition, is good, although the parcels be several and in several towns." Co. Lit. 253, (a). The same principle is laid down by Stearns, in his work on Real Actions, 45. 8 Cranch. 229. Litt. Sec. 417, does not limit the entry to any particular class of cases, but says, " if a man hath cause to enter into any lands or tenements in divers towns, in one same county," &c. The law, it is said, does not require vain and useless acts. Judge Shepley, having made the entry, and declared, in the presence of Spring, that he, as agent of the bank, entered to foreclose the mortgage, that is, all the parcels mentioned in the deed of mortgage, would have performed but an empty ceremony, to have gone into the other parcels of land.

The object of the statute in requiring an entry to be made, was to give notice of the intention to foreclose, it was not to regain a lost seizin, for that remains in the mortgagee, between him and the mortgagor. Here was an entry on part for the whole, and the mortgagor had express notice.

In *Spring* v. *Haines*, 21 Maine R. 126, the question was, whether a redemption could be had of those parcels of real

estate which had not been foreclosed, and which were included in the same mortgage with other parcels, that had been foreclosed, without a payment of the whole debt, secured by the mortgage. It was not controverted in that case, that some of the parcels had not been foreclosed. The reasoning of the Court is predicated upon those facts. In the present case, one of the questions is, whether the whole was foreclosed. The conclusion in the present case, that there was a foreclosure as to all the parcels, does not conflict with the decision of *Spring* v. *Haines.* The two cases are dissimilar.

The deed to Webster was made July 13, 1836, more than three years after the entry. The payment made was not intended to discharge the mortgage, but was a consideration for the conveyance from the trustees to Webster, and so acknowledged in the deed, which was taken by the tenant acting for Webster. Were there no other evidence of foreclosure, the recital in the deed to Webster, " the right of redemption having expired," would be very strong evidence, if not conclusive, upon the tenant of that fact. The tenant procures a deed to be made, in which it is stated, that his own right to redeem is gone, that the money is paid by the grantee, and takes the deed containing these recitals, and either procures it to be recorded or hands it to the grantee. These acts of Spring are in perfect harmony with the other evidence in the case, that on the thirteenth of July, the time of redemption had expired, and the mortgage was foreclosed. The tenant offered to prove, as evidence of a waiver of the entry, that the money received had been immediately divided among the stockholders; that on the tenth of May, 1836, a policy of insurance, held by Spring on the mansion house and lot, had been assigned to the trustees, that the arrangement to transfer the policy was made May 9, at the same time, when the check drawn by Webster was taken by King, and that after the entry to foreclose, Spring made divers payments on the original notes, for which said six thousand dollar note and the mortgage were given, as collateral security, which payments were accepted and indorsed on said notes."

The division of the money among the stockholders would have taken place, whether received in discharge of the mortgage, or as the consideration of the sale of an absolute estate. The money belonged to the bank but it was no longer needed for banking purposes, as the bank was then closing up its affairs.

The assignment of the policy of insurance, to be held by the trustees after the expiration. of the three years from the time of the entry, and the payments, which are offered to be proved, tend very clearly to show a willingness on the part of the trustees, to allow the tenant to redeem. But Spring did not claim to have these acts so considered. The waiver, which is alleged to arise, by implication, was not accepted by him. He preferred, that the mortgage should be considered as foreclosed. The principle may be correct, that a reception of the money due on the mortgage, or even a part of it, is a waiver of the foreclosure. *Deming* v. *Comings*, 11 N. H. Rep. 474. But where the mortgagor directs a deed to be made to a third person, and procures a recital to be inserted in the deed, that the right of redemption had expired, the implied evidence becomes nugatory, against that, which is of a character so positive and express. In *Deming* v. *Comings*, one ground relied upon was, that there was a tender within the year. Articles of produce had been received, which by the agreement, were to be applied in payment. Afterwards these articles were paid for, in a different manner. The Court say, that the defendant *rescinded* the contract, by which the produce was to be applied, to the payment of the mortgage debt. If, then, there had been a contract between Spring and the trustees, that the entry should be waived or the time of redemption enlarged, upon certain conditions; according to the authority of *Deming* v. *Comings*, Spring could rescind that contract.

The reception of the evidence offered could not have changed the result.

It is contended that the levy is defective, because it is made upon one parcel as the property of Webster and Burnham,

and upon the other, as the property of Webster alone. According to the view taken of the case, the fee was in Webster, at the time of the attachment, and the officer, in his return, states they were both duly notified of the making of the levy. If the title to the land were in either of them it passed by the levy to the demandant. *Herring et al.* v. *Polley*, 8 Mass. R. 113; *Crafts* v. *Ford*, 21 Maine R. 414.

The rights of Mrs. Spring cannot be taken from her, unless she has legally parted with them, and they will depend upon principles of law, applicable to her, in a state of coverture, and may be determined upon future investigation.

By the agreement, contained in the report of the Judge, before whom the case was tried, the verdict, which was for the demandant, is to stand, if it appears to be sustained by the evidence, which was "admitted and legally admissible;" and that, which was not received would not "have essentially varied the state of the case;" and it so appearing, therefore, there should be judgment on the verdict.